IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CR. NO. 2:13cr33-MEF |
| ) | |
| CLARENCE E. SMITH ) | |

### RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant's motion to suppress (Doc. # 62). The court has heard evidence on the suppression motion, and it has also carefully considered the motion itself and the United States' response. For the reasons set out below, defendant's motion to suppress is due to be denied.

### FACTS

From April through June, 2012, the Criminal Investigations Division of the Montgomery Police Department (MPD) began to notice that a large quantity of counterfeit bank notes were being passed in the city of Montgomery, Alabama. The paper and/or the serial numbers used for these notes either matched or were very similar, so investigators believed that the money was coming from a single source. On May 18, 2012, the MPD received a Crime Stoppers tip from an anonymous informant alleging that defendant Clarence Smith (alias Bubba) was making counterfeit money at a hotel on Zelda Road, offering females for prostitution, and acting as a hit man for hire. The tip stated that Smith was possibly involved with a gang, had weapons, and could be violent. It also indicated that

Smith's baby's mother was a woman named Rosie who drove a gray Mercedes.

At the time of the tip, the MPD was already familiar with Clarence Smith as a person of interest in several open homicide investigations. Subsequently, the department received information that Smith may have been involved in the murder of Reginald Shackleford on June 11, 2012. An Alcohol, Tobacco, and Firearms (ATF) source also indicated that Smith had been seen in possession of a .38 caliber revolver on several occasions. Officers decided to question Rosie Murphy, the mother of Smith's child, relating to the Shackleford homicide.

During questioning on June 13, 2012, Murphy provided information to the Secret Service concerning possible counterfeit activity by Smith. She also showed them a cell phone video of Smith using a pair of scissors to trim or cut notes printed on linen paper. The MPD decided to investigate this lead to get "leverage" for the homicide investigation.

On June 14, 2012, Murphy got in touch with Secret Service agents, who had contacted her earlier on an unrelated matter, to tell them that Smith had called and asked her to deliver him some ink cartridges that they had stolen from Wal-Mart the day before. Smith also wanted genuine $100 and $50 bills so he could replicate them. The Secret Service provided the currency to Murphy with the intent to follow her, in concert with MPD officers using undercover vehicles, to an address on Bidford Way where Murphy would deliver the ink cartridges and genuine currency to Smith and attempt to take pictures of whatever apparatus he was using to counterfeit currency. However, although Murphy complied and

2

proceeded to the Bidford Way address, she subsequently texted the Secret Service to say that too much time had elapsed in getting there, and Smith had already left.

The next day, on June 15, 2012, a woman named Shanara Clark was apprehended with counterfeit money in her possession at a local Wal-Mart. She was arrested and transported to the Criminal Investigations Division. Officers determined that the currency in Clark's possession was very similar to the counterfeit currency that they had seen earlier. They interviewed Clark, who told them that she had purchased a quantity of counterfeit money at a residence on the west side of town, which she was able to identify as a house on Bidford Way using maps with turn-by-turn directions and a photograph. Officers recognized this residence as one belonging to Clarence Smith.

At this time, the MPD believed that it had enough information to move forward with a state charge against Smith for criminal possession of a forged instrument. However, investigators felt they still could not specifically determine whether Smith was the manufacturer or was merely possessing or obtaining counterfeit notes. In consultation with the Secret Service, MPD officers set up a plan for surveillance to obtain further information or locate additional residences where Smith might be manufacturing or possessing counterfeit currency.

Murphy contacted the Secret Service again that afternoon and indicated that Smith wanted the ink delivered a different address from the Bidford Way residence. Secret Service and MPD officers met Murphy at the T.A. Travel Plaza between 3:30 and 4:00

p.m. to provide her again with genuine currency with the intention of following her when she delivered the ink and the money. Murphy was to relay information to a Secret Service agent by cell phone, which he would in turn share with all the other officers, and to take pictures or video of the method Smith was allegedly using to duplicate the currency.

Officers followed Murphy and saw her pick Smith up in her vehicle. Some time later she was able to call and text the information that Smith was going to various different houses to collect counterfeit currency in order to use it to leave town because he knew the police were after him. After they stopped at a couple of residences, Murphy communicated around 7:21 pm that she and Smith were headed to Woodley Road. Prior to this time, Corporal Joel Roberson of the MPD's Highway Safety Team had been told over the radio by other MPD officers participating in the surveillance that once enough probable cause had been developed to arrest Smith, he would be asked to conduct a traffic stop in order to take Smith into custody. The officers informed Roberson that Smith was believed to be involved in counterfeiting, was a suspect in a homicide, and was known to carry a .38 revolver. When Murphy's vehicle reached Woodley Road, Roberson caught up with her car and was told to go ahead with the traffic stop, which was captured on video (Government's Exhibit 2).

Roberson used the rolling radar in his vehicle to clock the speed of Murphy's car and found that her vehicle was traveling 46 mph in a 35 mph zone. Roberson had been advised that a confidential informant was driving the car, and that the traffic stop was being made to take the passenger into custody without giving away the confidential informant. Roberson

4

activated his lights and pulled Murphy's car over at approximately 7:31 pm. A S.W.A.T. truck pulled behind him as he made the stop.

Roberson walked up to the passenger side of the vehicle and knocked on the window until Smith rolled it down approximately four inches. Roberson observed an open beer container sitting in the center console. Roberson asked Smith to roll the window down the rest of the way, intending to ask the driver for her license and insurance and get her to the back of the car. Smith said that the window did not roll down. Roberson asked Smith to open the door. Instead, Smith reached over, locked the door, and rolled the window all the way up. He then reached toward the center console. Roberson was concerned that Smith was going for a weapon. He drew his own weapon and aimed it at Smith. Smith immediately reached straight for the ceiling.

Roberson continued to command Smith to open the door, until another officer was able to unlock it from the left side. Smith reached again for the center console, and Roberson told him, "Don't you reach into that car." Roberson began removing Smith from the vehicle. Smith resisted, "[j]ust acting his deadweight pulling against me." Roberson had by this point re-holstered his weapon. He told Smith, in a continued effort to make the incident look like an ordinary traffic stop, that if everything was okay and he did not have any tickets they were going to let him go. Roberson handcuffed Smith for the safety of the officers and himself and placed Smith sitting down on the curb on the side of the street. He did not announce to Smith that Smith was under arrest.

Roberson asked who owned the vehicle, and Murphy said that it was hers. Smith asked Murphy if she had given permission to search the car, and she indicated that she had not. After additional conversation, Roberson proceeded to search the car, believing that the open container gave him the right to search anywhere where more alcohol could be, and also that because they had a confidential informant driving the vehicle for the purpose of picking up counterfeit currency so police could conduct a traffic stop, she would have consented to the vehicle search based on his experience with informants. During the search, officers located a gun in the center console of the vehicle underneath $4,745 in counterfeit currency.

Roberson searched Smith himslef for weapons. He believed that even though Smith was handcuffed, he could still reach around and retrieve a weapon. Roberson knew that Smith would be placed with him in his patrol car for transport, and desired to check his pockets for officer safety. Roberson asked Smith what was in his pockets, and Smith replied, according to Roberson, "'some pills and shit'" for him to smoke on." Roberson then announced that Smith was under arrest for narcotics.

## DISCUSSION

At the suppression hearing, Smith's counsel indicated that his primary goal is to suppress the firearm discovered in the center console of the vehicle in which Smith was a passenger. Smith's theory for suppressing the weapon is that certain un-Mirandized

statements he made concerning the contents of his pocket ("pills and marijuana" [1]) led to his arrest, and his arrest in turn led to the search of the automobile during which police found the weapon. In other words, defendant claims that the gun is due to be suppressed as the "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471 (1963); United States v. Delancy, 502 F.3d 1297 (11th Cir. 2007). Defendant also seeks to suppress the un-Mirandized statements that he claims led to his arrest, but only to the extent that the statements were responsible for the officers' subsequent search of the vehicle and discovery of the firearm.[2]

The United States maintains, *inter alia*, that officers searched the car and seized the gun because of an open container violation, not because of defendant's arrest for narcotics possession. It also contends that, as a passenger without a possessory interest in the vehicle, Smith does not have standing to challenge the vehicle's search. The court addresses the standing argument first.

1. <u>Standing</u>

In cases such as this one, the court does not analyze a passenger's "standing" to challenge a vehicle search in the traditional sense. In Rakas v. Illinois, 439 U.S. 128

---

[1] According to defendant's counsel at the suppression hearing, Corporal Roberson asked him, "What's this in your pocket?" Defendant said, "That's my personal stuff." Corporal Roberson asked, "Personal stuff like what?" Defendant replied, "Pills and marijuana." See also Motion to Suppress at 2 (different wording).

[2] To the extent that defendant argued any other grounds for suppression in his motion, these were waived at the suppression hearing.

7

(1978), the Supreme Court "abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched." Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). The Court chose this approach because "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas, 439 U.S. at 133-134. Under Rakas, the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. Id. at 132 n. 1 (1978).

In the context of passengers in a private car, the Supreme Court "has held that a passenger, who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008); see also United States v. Melgar, 927 F.Supp. 939, 948 (E.D. Va. 1996) ("the law is clear that the passenger of a vehicle has no reasonable expectation of privacy in the vehicle's contents.")(citing Rakas, 439 U.S. at 134 (articles in glove compartment and under seat); United States v. Rusher, 966 F.2d at 874 (articles in bed of truck); United States v. Paulino, 850 F.2d 93 (2d Cir.1988) (articles under floor mat of car)). As the Melgar court noted,

> [t]his principle extends to personal property the passenger may have placed in another's car; '[a] person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects... .' United States v. Hargrove, 647 F.2d 411, 413 (4th Cir.1981). In addition, because of the personal nature of the Fourth Amendment's protection, an individual has no reasonable expectation of privacy in articles of which he has disclaimed ownership. United States v. Leshuk, 65 F.3d 1105, 1111 (4th Cir.1995) (stating that "a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property").

Melgar, 927 F. Supp. at 948; see also United States v. McKennon, 814 F.2d 1539, 1546 (11th Cir. 1987) (when one relinquishes possession and disclaims ownership of any article, any expectations of privacy become illegitimate).

In the instant case, Smith concedes that he was not the owner of the automobile that the officers stopped and searched, and instead was simply a passenger. Nor does he contend that he owned the weapon seized – to the contrary, defendant's motion to suppress indicates that Smith "has always maintained that he had no connection to the firearm found in the vehicle." Doc. # 58-1 at 3. Accordingly, Smith had no reasonable expectation of privacy in the vehicle or the firearm and, therefore, he fails to establish that his own Fourth Amendment rights were violated by the challenged search and seizure. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134.

However, Smith – who essentially conceded at the suppression hearing that he does

not have "conventional standing"– still maintains that he enjoyed a different kind of expectation of privacy in the vehicle. He argues that the fact that the owner of the vehicle, Rosie Murphy, declined to give her consent to search led to a legitimate expectation on his part that the officers would not search the vehicle. This argument is admirable for its creativity, but nevertheless unavailing. Murphy's failure to consent did not convey to Smith any possessory interest in the car. If anything, her assertion of control by declining consent only reemphasized Smith's own lack of authority over the vehicle.  At all times, Murphy retained the right to exclude others, and she alone could have granted or revoked consent at any time. Accordingly, Smith had only a hope of privacy – not a legitimate expectation of the kind that the Fourth Amendment was designed to protect, or that society would be prepared to recognize as objectively reasonable. See Rakas, 439 U.S. at 140; United States v. Segura–Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006).

In the alternative, even if defendant had possessed a reasonable expectation of privacy in the vehicle, the officers were entitled to search it for evidence of a crime. Under Alabama law, "[i]t is unlawful for a person to have in his or her possession alcoholic beverages in an open container in the passenger area of a motor vehicle of any kind on a public highway or right-of-way of a public highway of this state." Ala. Code §35-3A-330(b). Under the so-called "automobile exception," the Fourth Amendment does not require police to obtain a warrant to search a vehicle which they have probable cause to believe contains evidence of a crime. See Cal v. Carney, 471 U.S. 386, 392-93 (1985);

California v. Acevedo, 500 U.S. 565, 579–80, (1991); United States v. Ross, 456 U.S. 798, 823 (1982); United States v. Lanzon, 639 F.3d 1293, 1300 (11th Cir. 2011); Brown v. United States, 219 F. App'x 917, 919 (11th Cir. 2007).

In this case, Corporal Roberson testified that when he first walked up to the car he observed an open beer container in plain view in the center console. This was sufficient to establish probable cause that the vehicle, which was readily mobile, contained evidence of the offense of possession of an alcoholic beverage in an open container in the passenger area of a motor vehicle on a public highway. For this reason also, defendant's suppression motion as to the vehicle search is due to be denied.

2.  Statements

Defendant seeks to suppress his statements concerning the contents of his pockets, contending that they were the product of custodial interrogation without benefit of Miranda warnings, and that the statements in turn led to defendant's arrest and the search of the vehicle. This argument is without merit.

"Police are not generally required to give Miranda warnings during ordinary Terry stops." United States v. Viezca, 555 F. Supp.2d 1254, 1263-1264 (M.D. Ala. 2008) (citing Pennsylvania v. Bruder, 488 U.S. 9, 10 (1988) (Persons temporarily detained pursuant to such stops are not "in custody" for the purposes of Miranda.)). However, investigative stops may mature into arrests under certain circumstances, and the right to Miranda warnings

11

attaches when custodial interrogation begins. United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004). One such circumstance arises where an individual has been formally arrested or subjected to a restraint on his or her freedom of movement of the degree associated with a formal arrest.

"Normally courts apply a two-part test to determine whether a suspect is in custody for Miranda purposes: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Acosta, 363 F.3d at 1148 (citation omitted). However, as the Acosta Court noted, "a suspect who is detained during a Terry stop is not free to leave from the beginning of the stop until it ends. If we applied the general Miranda custodial test literally to Terry stops, the result would be that Miranda warnings are required before any questioning could occur during any Terry stop." Id. Accordingly, the appropriate inquiry in the context of a Terry stop is, instead, whether the encounter involved a highly intrusive coercive atmosphere – that is, in this case, whether the totality of the circumstances was such that a reasonable person in Smith's position would have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. Id. at 1151: see also United States v. Stamps, 2005 WL 6125472, 4 (M.D. Ala. 2005) (noting as relevant factors (1) whether a reasonable person in the defendant's shoes would have understood that his detention was not likely to be temporary and brief; and (2) whether the person stopped under the

circumstances would feel that he was completely at the mercy of the police) (citing Berkemer v. McCarty, 468 U.S. 420, 438 (1984)).Under the objective standard applied to determine whether an individual is in custody, the reasonable person from whose perspective custody is defined is a reasonable innocent person. United States v. Street, 472 F.3d 1298, 1309 (11th Cir.2006).

In the instant case, the traffic stop occurred in daylight hours on a public roadway where the participants easily could be observed by passers-by. The officers did not disclose to Smith that he was being sought in connection with counterfeiting or a murder investigation; instead, they conducted the encounter as an ordinary traffic stop – for which they had clear probable cause, given the speeding violation – in order to protect their confidential informant. Thus, Smith had no reason to understand that his detention was not likely to be temporary and brief. Although Corporal Roberson testified that he himself considered Smith to be under arrest when he was restrained, defendant was not actually informed that he was under arrest prior to making the statements in question.

It is true that defendant's statements were made after he was removed from the vehicle and handcuffed, and that, as the video shows, at least one of the officers still held a shotgun at the ready at that time (albeit at some distance from defendant, and not pointed in his direction). However, "the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest." United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995); see also United States v. Beltran, 367

Fed.Appx. 984, 988, 2010 WL 729241, 2 (11th Cir. 2010), *judgment vacated on other grounds*, Beltran v. United States, 131 S.Ct. 899, 178 L.Ed.2d 739, 79 USLW 3398 (U.S. Jan 10, 2011). Here, Smith previously had locked his door and rolled up his window instead of rolling it down when he was asked to do so. Several times, he had also reached toward the center console, where officers were concerned he was possibly in possession of a .38 revolver that he was known to carry. Smith also had resisted getting out of the vehicle. And he continued to reach back toward the console even while officers sought to restrain and cuff him and place him on the curb. Accordingly, the officers' actions in removing Smith from the car and restraining him, both for their safety and his, were reasonable responses to Smith's own acts, rather than affirmatively coercive efforts to cause Smith to confess or else.

Thus, under the totality of the circumstances, the traffic stop did not involve the type of highly intrusive coercive atmosphere that may require Miranda warnings even before a formal arrest is made. A reasonable innocent person in Smith's position would have believed that he merely was involved as a passenger in an ordinary traffic stop, not that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No Miranda warnings were required at the time, and Smith's statements are not due to be suppressed. *A fortiori*, even if the weapon had been found as a result of Smith's arrest, and the arrest had been based on his statements, Smith also is not entitled to suppression of the weapon as the "fruit of the poisonous tree."

14

**CONCLUSION**

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. # 62) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before December 31, 2013. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 18th day of December, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE